UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CRISTIAN DIAZ,**

    Plaintiff

        v.

**WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE, WAYNE
STATE UNIVERSITY/ SCHOOL OF
MEDICINE PROFESSIONALISM
COMMITTEE, WAYNE
STATE UNIVERSITY/ SCHOOL OF
MEDICINE STUDENT PROMOTIONS
COMMITTEE, and
DARIN ELLIS, WAEL SAKR,
KELLY GROSS, LORETTA
ROBICHAUD, RICHARD BAKER,
CHRISTOPHER STEFFES,
ADAM ZANGERLE,
ERIC AYERS, and NICHOLAS YARED,
each in their individual and official capacities,**

    Defendants.

Case No.
Hon.

---

Law Offices of Ward & Stachurski, PLLC
Veronica L. Stachurski (P85110)
*Attorneys for Plaintiff*
4131 Okemos Rd., Suite 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

---

## **COMPLAINT AND JURY DEMAND**

This is an original proceeding; there is no pending or resolved civil
action arising out of the transaction or occurrence alleged in this
Complaint.  This is not a class action lawsuit.

NOW COMES Plaintiff, Cristian Diaz, by and through his attorneys, Law Offices of Ward & Stachurski, PLLC, to hereby timely file his Complaint and Jury Demand.  In support of his Complaint, Plaintiff states the following:

## PARTIES, JURISDICTION, AND VENUE

1. This is an action for unlawful depravation of constitutional rights in violation of 42 USC § 1983, unlawful discrimination and retaliation in violation of the Americans with Disabilities Act (ADA), unlawful discrimination and retaliation in violation of the Persons with Disabilities Civil Rights Act (PWDCRA), unlawful discrimination and the creation of a hostile education environment in violation of the Elliott-Larsen Civil Rights Act (ELCRA), and for breach of contract under Michigan law and policy.

2. Plaintiff, Cristian Diaz, is a citizen of the United States of America.

3. At the time of the events giving rise to this Complaint, Plaintiff was a resident of the State of Michigan.  However, Plaintiff is currently a resident of the State of Washington.

4. Defendants Wayne State University (Defendant University) and Wayne State University School of Medicine (Defendant Medical School) are public universities that hold themselves out for admission by the public, and who operate under the laws of the State of Michigan and the United States of America.

   a. Defendants Wayne State University School of Medicine Professionalism Committee, and Wayne State University School of Medicine Student Promotions Committee, are public committees and/or governing bodies within the University and which held significant decision making power at all times relevant to this Complaint.

2

5. To the best of Plaintiff's knowledge and information, Defendant Darin Ellis is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

   a. At all times relevant to this Complaint, Defendant Darin Ellis was the Vice Provost for Academic Programs, Assessment & Accreditation at Defendant University.

6. To the best of Plaintiff's knowledge and information, Defendant Wael Sakr is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

7. To the best of Plaintiff's knowledge and information, Defendant Kelly Gross is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

8. To the best of Plaintiff's knowledge and information, Defendant Loretta Robichaud is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

9. To the best of Plaintiff's knowledge and information, Defendant Richard Baker is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

10. To the best of Plaintiff's knowledge and information, Defendant Christopher Steffes is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

11. To the best of Plaintiff's knowledge and information, Defendant Adam Zangerle is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

12. To the best of Plaintiff's knowledge and information, Defendant Eric Ayers is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

13. To the best of Plaintiff's knowledge and information, Defendant Nicholas Yared is a citizen of the United States and the State of Michigan, and works and resides in Wayne County, Michigan.

14. To the best of Plaintiff's knowledge and information, all persons named as Defendants work in Wayne County, Michigan.

15. Defendant University and Defendant Medical School are located in the City of Detroit, Wayne County, Michigan, with a principal place of business at 540 E. Canfield Ave., Detroit, MI 48201.

   a. Upon information and belief, Defendants Wayne State University School of Medicine Professionalism Committee, and Wayne State University School of Medicine Student Promotions Committee (collectively "Defendant Committees") maintain a principal place of business and operations at 540 E. Canfield Ave., Detroit, MI 48201 and/or within the named Universities.

16. Jurisdiction is proper in this court under 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions.  Jurisdiction is also conferred by 28 U.S.C. § 1343(a)(3) and (4).  Additionally, this federal court has jurisdiction in this case pursuant to 28 U.S.C. § 1367, which authorizes federal courts to exercise supplemental jurisdiction over state-law claims arising from the same core operative facts.

4

17.     Plaintiff does not concede that the filing of a Notice of Intent was statutorily required in this case, but Plaintiff did file a Notice of Intent with the Michigan Court of Claims within one year of the injuries set forth in this Complaint.

18.     Venue is proper because the Defendants' principal place of business and/or domicile, and the majority of the events alleged in this Complaint took place in the Eastern District of Michigan, in Wayne County, Michigan.

**COMMON ALLEGATIONS**

19.     When the events giving rise to this complaint occurred, all individual Defendants, who are deputies of Defendant University, Defendant Medical School, and/or Defendant Committees, were acting within the scope of their employment and under color of state law.

20.     At all material times, Defendant University and/or Defendant Medical School employed all individual Defendants and are liable for their acts and/or omissions.  Defendant University and Defendant Medical School are also liable because of their policies, practices, and customs, which led to this Complaint.

21.     At all times relevant to this Complaint, Defendants were bound by the policies and procedures of the Universities.  This includes the School of Medicine Handbook, the Committee Charters and/or handbooks, as well as the rules, regulations, policies, and procedures set forth therein.

22.     Defendants made clear that they intended for all parties to be bound by these rules and regulations by enforcing them against Plaintiff.

5

23. However, Defendants failed to perform the duties and obligations to which they were bound under the terms of the legally enforceable agreements.

24. Defendants engaged in this activity while depriving Plaintiff of his Constitutional due process rights.

25. Defendants breached their legal obligations to Plaintiff (as set forth in more detail below), which they had a pattern and/or practice of violating, intentionally, with extreme disregard for Plaintiff's rights.

## FACTS AND PROCEDURAL HISTORY

26. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

27. At all times relevant to this Complaint, Plaintiff performed his duties as a student and future medical professional in a satisfactory or above-satisfactory manner.

28. Plaintiff was accepted into Wayne State University School of Medicine ("Defendant Medical School") on or about October 20, 2020 to begin the process of enrolling in the School of Medicine.

29. From the time that he began the enrollment process, Plaintiff made it clear that he was a student who had financial struggles, and who would need financial assistance to progress through his studies while at WSU School of Medicine.

   a. Defendant Adam Zangerle was assigned as the Financial Aid Officer for Plaintiff.

30. Plaintiff began his studies in the Medical program in July 2021.

31. Within one year of beginning his studies, Plaintiff had to approach Defendant Zangerle to discuss the financial difficulties that he was facing.  Plaintiff brought to Defendant Zangerle's attention that Plaintiff was not receiving the same financial aid that some of his peers were receiving.  This included, by way of one example, his knowledge that another

6

student in the same program, but who is not ethnically Latino, was receiving significantly more financial aid and assistance than Plaintiff was receiving.  By way of another example, Plaintiff's financial aid was regularly disbursed later than other students enrolled in the program, which caused significant additional hardship for Plaintiff.

    a.  Defendant Zangerle's response was to tell Plaintiff, "it is not my fault or the school's fault that your peers are more privileged than you. If you think you need more money, you should consider selling your car and riding the bus."

32.   It was clear to Plaintiff that Defendant Zangerle harbored animosity toward Plaintiff, but he was not willing to allow this to deter him from completing his studies.  Therefore, Plaintiff attempted to find a resolution to his issues from other staff members.

    a.  This included, but was not necessarily limited to, attempting to work with his assigned counselor, Defendant Loretta Robichaud.

33.   Unfortunately for Plaintiff, Defendant Robichaud showed even more disdain and hatred toward Plaintiff than did Defendant Zangerle.  In February of 2022, during a snow storm, Plaintiff requested an excused absence from Defendant Robichaud due to the hazardous weather conditions.  Defendant Robichaud replied by saying that Plaintiff was not going to be receiving the excused absence, and that if Plaintiff did not show up, she was going to issue a professional citation. This is the first, but not the only example of Defendant Robichaud retaliating against Plaintiff for standard requests in a way that she did not retaliate against other students outside of Plaintiff's protected classes.

    a.  Despite the serious risk to his personal safety, Plaintiff drove to campus because Defendant Robichaud refused to excuse his absence.  However, Plaintiff then learned that other students who are not disabled, who are not gay, and who are not

members of Plaintiff's protected class, were immediately awarded excused absences due to the inclement weather that day.

34. In or around April 2022, Plaintiff approached Defendant Robichaud to request assistance regarding the financial and emotional struggles he was facing.

35. As early as May 2022, Defendant Robichaud began pressuring Plaintiff to take a leave of absence. Upon information and belief, Defendant Robichaud was attempting to pressure Plaintiff into taking a leave of absence so that she would not have to consider the complaints Plaintiff was bringing to her regarding his mental health concerns and the hostility/discrimination he faced.

36. In the course of continuing his studies, Plaintiff was facing significant troubles, both financially and related to his mental health.

37. Despite these hardships, Plaintiff persevered, and in February 2023, Plaintiff took the USMLE STEP 1 Board Exam and passed on his first attempt.

38. In or around April 2023, Plaintiff began his clinical clerkships.

39. A medical student must progress to a certain level of the program to begin clerkships, and must be performing in an academically satisfactory manner in order to participate in these clerkships.

   a. Plaintiff was meeting or exceeding the minimum requirements of students to engage in these clerkships at all times relevant to this Complaint.

40. Defendant Robichaud's response was to tell Plaintiff that she may force him to take a leave of absence, whether voluntary or involuntary.

41. Defendant Robichaud made this statement and treated Plaintiff differently than other students similarly situated to him because of his socioeconomic status, and because he is a male, gay, Hispanic student.

42. Defendant Robichaud did not make these threats to medical students of other race(s), gender, sex, and/or sexual orientation.

43. Despite this mistreatment, Plaintiff continued with his studies.

44. Also in June 2023, Plaintiff successfully completed a surgery rotation with Erin Field.

45. However, given the ongoing hostile working and learning environment that Defendant Robichaud and others were creating, Plaintiff submitted a request to Defendant Medical School, by and through Dean Chadwell, for a new counselor.

46. However, because Defendants maintained intentional discriminatory intent and were predetermined to take discriminatory actions against Plaintiff, his request for a new counselor was ignored.

47. Defendants had an established pattern and practice of condoning and facilitating discrimination by its employees and agents.

   a. By way of one example, Defendant Robichaud pressured another Hispanic student into quitting the medical program just months before Plaintiff faced similar pressure by Defendant Robichaud .

   b. This student, "Student B," who was also Hispanic, told Plaintiff that he was pressured into quitting due to harassment and retaliation by Defendant Robichaud and other Defendants' agents and employees until he had no choice but to leave.

c. Defendants University and Medical School were aware of the ongoing mistreatment of students of particular categories, including Plaintiff and "Student B."

48. Moreover, Erin Field evidently submitted a professionalism citation against Plaintiff, to Defendants Professionalism Committee, and/or Promotions Committee, as well as other Defendants, including Defendant Medical School staff and faculty.

49. Plaintiff did not receive notice of this citation.

a. Despite binding policies to provide evidence of allegations submitted against students, Plaintiff never received any information as to the citation submitted by Ms. Field against Plaintiff.

b. Furthermore, Plaintiff was never allowed a meaningful opportunity to review any evidence and/or confront his accuser(s), and/or make any informed defense because he was unaware of the allegations lodged against him until it was too late.

50. Plaintiff continued to progress through his studies, meeting or exceeding academic expectations, without any knowledge as to any concerns Defendants may have had regarding his status as a student enrolled at Defendants University and School of Medicine.

51. On August 9, 2023, Plaintiff was nominated for, and received, an academic award called the PEARLS award.

52. Plaintiff had a meeting with Dr. Smitherman on or about August 24, 2023, regarding steps he was taking to improve his performance in the Defendant Medical School program, including what was labelled "corrective measures."

53. Plaintiff was not aware at this time that the named Defendants intentionally withheld this information from the Promotions Committee.

54.   In November 2023, Plaintiff began speaking with Defendant Yared, outside of class. Some of these conversations included conversations of a romantic nature.

55.   Plaintiff considered an invitation by Defendant Yared to come to Defendant Yared's home in the evening, but ultimately decided not to engage in the romantic advancements because Plaintiff was afraid of the potential negative consequences it may have on his blossoming career.

56.   Therefore, Plaintiff cancelled a *voluntary, extracurricular* shadowing that he had scheduled with Defendant Yared. At no point was this shadowing required in Plaintiff's academic curriculum.

   a.   However, Plaintiff later learned that Defendant Yared intentionally lied and misrepresented facts to Defendants' agents, including Abigail Entz. Plaintiff did not learn of Defendant Yared's retaliation and intentional misrepresentation until Plaintiff was facing academic discipline.

57.   During this same time, Plaintiff was being forced to suffer in hostile working environments, as well as a hostile education environment in the rotations that he was assigned at medical provider locations for clinical rotations.

58.   This included, but was not necessarily limited to, supervisors and other persons in positions of power and authority causing severe distress for Plaintiff in his education and workplace while he was attempting to complete his workplace duties and academic requirements.

59.   This also included individuals in the school making discriminatory and derogatory comments about Plaintiff on the basis of his ethnicity and/or race. This includes, but is not necessarily limited to, statements that if Plaintiff was "smart enough to be an immigrant and get into medical school, he should be smart enough to learn English."

11

a. By way of another example, on or about August 18, 2023, Plaintiff was scheduled to complete a rotation with Dr. Mary Burton and Dr. Desai.  However, due to a storm, a tree fell and he was unable to leave his apartment.  When he told Dr. Burton this, she responded, in front of Plaintiff's colleagues and peers, "I hear you are the guy who is giving us problems here."  "Us" referred to Defendants, as well as the location of the rotation.

b. Doctor Burton engaged in harassing and discriminatory behavior toward and against Plaintiff throughout his time at this rotation. This included, but was not necessarily limited to, Doctor Burton intentionally concealing patient's files/information that Plaintiff needed for patient encounters, as well as prohibiting medical assistants from working with Plaintiff in standard practice for patient encounter(s). Dr. Burton's created this hostile educational environment with discriminatory intent because Plaintiff is gay, Hispanic, male and suffered from disabilities.  This intentional harassment and discrimination was designed to cause Plaintiff to be unsuccessful in his rotation.

c. As a direct result of Dr. Burton, and all other Defendants' actions and/or inactions, Plaintiff was disciplined and reprimanded for the very discriminatory and harassing behavior that he was forced to endure.

60. Due to the continued harassment and hostile work environment Plaintiff was forced to endure at the hands of Defendants, and due to the intentional refusal by Defendants Robichaud, Yared, and Zangerle to remediate any mistreatment that Plaintiff continued to suffer, Plaintiff requested a meeting with Marianne Soroka-Martin (Pediatrics Rotation

Coordinator).  Plaintiff attempted to explain to her that he was being forced to work and learn in a hostile environment. Ms. Soroka-Martin  and Dr. Smitherman ignored Plaintiff.

    a.  This included, but was not limited to, ignoring Plaintiff's reports that Dr. Smitherman was engaged in discriminatory and harassing conduct such as openly mocking and making fun of Plaintiff in front of other medical students.

    b.   Plaintiff  was so humiliated that he cried in his car during his lunch break.

    c.  Defendants then used his time away from the rotation to accuse Plaintiff of being tardy, and further discipline him for Defendant's continued harassing and discriminatory conduct.

    d.  Dr. Smitherman and the other Defendants would not have ignored Plaintiff if he were not Hispanic, male, gay and/or disabled.

61.    In October 2023, Dan Cotton, a Henry Ford Resident, lied to certain supervisors and/or Defendants' representatives regarding Plaintiff's attendance.

    a.  Upon meeting with Dr. Karmally, Plaintiff confirmed his attendance during all dates required, but for one excused absence.  However, Defendants accused Plaintiff of being a liar.  This baseless accusation was made as a result of Plaintiff requesting accommodations due to his mental disabilities, as well as in retaliation for reporting that he was being harassed and discriminated against on the basis of his race/ethnicity, sexual orientation, gender, and disability.

62.    In or around October 2023, Plaintiff cancelled the extracurricular shadowing of Defendant Yared, as noted above.

    a.  However, near or around that time, Defendant Yared intentionally and maliciously misrepresented facts to Abigail Entz.  This included Defendant Yared telling Ms.

Entz that Plaintiff had missed a clinical rotation with his office and that Plaintiff "called [Dr. Yared], asking him to lie and tell Ms. Entz that he attended the clinic when he did not."

b. Plaintiff never asked Defendant Yared to lie for him. Moreover, Plaintiff was not obligated or bound to attend any clinical events with Dr. Yared at this time. The shadowing that Plaintiff had scheduled, and then cancelled, was completely voluntary and extracurricular.

c. Defendants, rather than praise Plaintiff's attempts to further expand his academic studies, engaged in an intentional and malicious persecution of Plaintiff that was based on his race/ethnicity, sex, sexual orientation, and disability.

63. One example of Dr. Entz unlawfully targeting Plaintiff was in November 2023, while Plaintiff was completing internal medicine rotations at Henry Ford Hospital. A Senior Resident, Sulmaz Zahedi, specifically told Plaintiff that Dr. Entz was "demanding reports of everything [Plaintiff] did and did not do." Zahedi told Plaintiff that Dr. Entz was "out to get" Plaintiff, and Dr. Entz was threatening others' jobs if they refused to provide this detailed and unnecessary information about Plaintiff.

a. Dr. Entz had no rational or legitimate basis for targeting Plaintiff in this manner.

b. Plaintiff was made aware that another classmate who is not a gay male, who is not Hispanic, and who does not have a disability did not show up for class on the same day that Plaintiff was reprimanded for being late. However, despite the fact that the other student failed to notify Defendant Robichaud, Entz, or Sulmaz, that other student was not disciplined.

14

c. Dr. Entz was intentionally engaging in this behavior due to discriminatory animus against Plaintiff due to his race/ethnicity, sex, sexual orientation, and disability. Dr. Entz and the Defendants were intentionally acting this way to cause Plaintiff's working and educational environment to be so unbearable as to cause Plaintiff to quit.

64. Defendant University and Defendant Medical School are liable for the actions of Dr. Entz, which were taken in furtherance of the school program and sponsored by Defendants University and/or Medical School.

65. When Dr. Entz's attempts to get Plaintiff to quit failed, she and the other Defendants engaged in an intentional and malicious strategy to cause Plaintiff to be removed from the program, as described herein and below.

66. Also in November 2023, the unlawful actions of Defendants caused Plaintiff to attempt to take his own life.

67. In or around November 2023, Plaintiff was also diagnosed with a stress-induced autoimmune disease, of which he informed Defendants.

68. Plaintiff completed his internal medicine clinical rotation in or around December 2023.

69. Plaintiff successfully completed the family medicine clerkship in January 2024.

70. Plaintiff excelled in the clerkship and Dr. Richard Bryce encouraged Plaintiff to apply for the Michigan Academy of Family Physicians externship/award.

71. Plaintiff received that award.

72. In yet another display of Defendants' predisposition to discriminate, harass, and retaliate against Plaintiff, Dean Chadwell pressured Plaintiff to decline this award multiple times.

73. Plaintiff was completing the neurology clerkship between January and February 2024.

74. As is clear from the objective milestones of completion, as well as Plaintiff earning awards for his success in this field, there was no legitimate reason to target Plaintiff for any disciplinary action.  The investigation and resulting actions by Defendants were unlawfully motivated by discrimination, harassment, and retaliation.  Plaintiff was the target of this unlawful treatment due to his race/ethnicity, sex, sexual orientation, and disability.

75. Plaintiff was forced to continue to suffer in hostile education and working environments during this time.

76. Due to this continued harassment and hostile work environment, Plaintiff attempted to take his own life for a second time (after successfully completing the Neurology clerkship).

77. Also during this time, Plaintiff was undergoing treatment and/or diagnoses of medical and/or mental health disabilities or disorders.

78. Therefore, Plaintiff took a medical leave of absence from February 28, 2024 through July 1, 2024.

79. However, as of the date of taking medical leave, Plaintiff still had never been made aware of any evidence of any alleged accusations or allegations against him.

**PLAINTIFF'S ATTEMPT(S) TO ENGAGE IN THE PROCESS AND PROCEDURES GUARANTEED TO HIM**

80. While Plaintiff was on a medical leave of absence (MLOA), he was harassed, berated, and belittled by Defendants.

81. This includes, but is not necessarily limited to, Defendants sending multiple copies of the same notice to Plaintiff that he would be investigated by Defendant Student Promotions Committee (SPC Letter).

   a. However, no evidence was provided to Plaintiff in any meaningful manner of time.

b. Moreover, Defendants attempted to pressure Plaintiff into engaging in the Committee process despite him being on MLOA, which they were doing to retaliate against Plaintiff for taking MLOA.

c. Defendants also used these continued communications to mislead and mischaracterize the timing of the supposed accusations against Plaintiff.

d. Defendants also intentionally tried to schedule Plaintiff's guaranteed hearing while he was still out on medical leave.

82. This was a calculated action by Defendants to attempt to deprive Plaintiff of his due process rights.

83. When that was unsuccessful, Defendants, by and through Defendant Ayers, intentionally interfered with Plaintiff's prepared statement, in order to sabotage Plaintiff's hearing.

a. This intentional retaliation and collusion included, but is not necessarily limited to, Defendant Ayers causing Plaintiff to completely change his prepared statement to Defendant Committees.

b. Defendant Ayers did this to prevent Plaintiff from having a meaningful opportunity to be heard.

c. Defendant Ayers manipulated Plaintiff and Plaintiff's statement to prevent him from a fair and/or impartial hearing.

84. Plaintiff's "hearing" before the Committee was held on or about July 31, 2024. This "hearing" came after months of being harassed by Defendants, without any meaningful opportunity to be heard, as all Defendants had collectively acted to interfere with Plaintiff's civil rights.

85. In reality, Defendants had made up their mind to remove Plaintiff and the hearing was nothing more than a pretextual sham to give the appearance of a hearing.

86. As of the date of the SPC letter, Defendants had refused to provide any evidence to Plaintiff, in violation of his Constitutional Due Process Rights, as well as in violation of their duties and obligations under their own policies, procedures, and handbooks.

   a. By way of one example, MD Student Handbook, Section 9.2 states that if a student is on a medical leave of absence, the student "may not engage in any element of the MD curriculum."  However, Defendants not only attempted to cause Plaintiff to engage in the MD curriculum while he was on leave, but disciplined him and retaliated against him for not doing so.

87. It was not until after Defendant Professionalism Committee referred Plaintiff to Defendant Promotions Committee that Plaintiff learned that his "absence" at the scheduled shadowing, mentioned above, was being used against him as a reason to discipline him.

88. Any reason or excuse from Defendants is a merely pretextual excuse to attempt to defend their intentional punishment of Plaintiff for voluntary actions.

   a. Defendant Yared complained about the "attendance issue" with regard to this voluntary activity in retaliation for Plaintiff declining his romantic invitation.

   b. Defendants University, Medical School, Promotions Committee, Professionalism Committee, Yared, Robichaud, and each and every person, agent, or employee involved with the unlawful decision to dismiss Plaintiff from the School of Medicine would not have used this excuse regarding a *voluntary, supplemental* activity planned by Plaintiff if Plaintiff was of a different race/ethnicity, sex, sexual orientation, and/or not disabled.

89. Plaintiff had no meaningful opportunity to defend himself or be heard because the "evidence" was not provided to him with any meaningful or reasonable notice.

90. Thus, Defendants intentionally violated Plaintiff's procedural and substantive due process rights, as well as their contractual obligations to Plaintiff to unlawfully remove Plaintiff from the medical school.

91. Defendants issued the removal decision on or about August 1, 2024.

   a. Plaintiff also notes that there was no meaningful opportunity for consideration or deliberation, as a full letter to dismiss Plaintiff had been prepared and disseminated in less than 24 hours after the sham "hearing."

   b. This is another clear demonstration of the lack of due process or any meaningful opportunity for Plaintiff to be heard.

   c. It is clear to a casual observer that Defendant did not engage in any fair "hearing."

92. On August 14, 2024, Plaintiff timely filed an appeal of the unlawful August 1, 2024 decision.

93. However, despite evidence on the very face of the appeal that Defendants intentionally failed to follow their own rules on basic procedural rights, his appeal was summarily dismissed.

94. Upon information and belief, there was no consideration of Plaintiff's appeal by Defendant Gross.

95. Upon information and belief, Defendant Gross and each and every individually named Defendant deliberately deprived Plaintiff of his rights. This includes, but is not necessarily limited to, breaching the legal obligations they had to Plaintiff to force him to be unlawfully removed from the medical school program.

19

    a.   This also includes Defendant Gross and any other persons who may become known through discovery to intentionally ignore the blatant disregard for Plaintiff's due process rights, including by violation of their own contracts and policies, to unlawfully and discriminatorily reject Plaintiff's appeal.

96.   Defendants engaged in the *appearance of* a process or procedure, but in reality refused Plaintiff actual access to the procedures to which he was entitled.

97.   Despite Defendant Gross and others ignoring Plaintiff's rights under the Constitution and the contracts to which they were bound, Plaintiff once again attempted to remediate the situation.

98.   Plaintiff timely filed an appeal to Defendant Provost on or about September 27, 2024.

99.   Plaintiff also included a letter of reference in this appeal to Defendant Provost.

100.   It is clear to a casual observer that Plaintiff, if he were being afforded real and proper procedural rights, would have been reinstated.

101.   Any appearance of an alleged procedure or process in this case is purely pretextual, as Defendants violated their own contractual obligations in order to ensure that Plaintiff was never allowed back into the medical school program.

102.   This violation of their own contractual duties and obligations under the charters, polices, procedures, and Handbooks, is also direct evidence of the deprivation of substantive and procedural due process rights in this case.

103.   The Promotions Committee Charter requires that evidence considered and/or used to take any adverse action must be disclosed to the student.

104.   Defendants intentionally refused to meaningfully or timely provide any information or evidence to Plaintiff.

105. On November 26, 2024, Defendants, by and through Defendant Darin Ellis, unlawfully removed Plaintiff from the medical program, without any proper consideration or analysis of the appeals that Plaintiff had submitted, and in direct violation of their own contractual guarantees.

106. Defendants' unlawful actions resulted in Plaintiff's unjustified removal from the medical school program at Defendant University and Defendant Medical School.

   a. Such unlawful removal was a violation of federal and state law.

   b. Plaintiff has shown sufficient bad faith by Defendants such that it should be presumed that Defendants engaged in a violation of federal and state law.

**COUNT I - UNLAWFUL  DEPRIVATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS IN VIOLATION OF THE 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION**
*against all School Defendants, and against all other Defendants in their individual and official capacities*

107. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

108. Plaintiff was a student, lawfully enrolled in the medical school, to complete his studies and earn a medical doctor ("MD") degree.

109. Plaintiff was performing all of his duties in a satisfactory manner. There is a high degree of certainty that Plaintiff would have graduated successfully, and was on track to complete the program as it was designed to be completed.

110. Plaintiff had a constitutional interest in his medical career, which had already begun, as well as his academic studies.

   a. These interests were also protected contractually.

21

111.    Defendants unlawfully interfered with Plaintiff's constitutional interests at stake in this case.

112.    Defendants feigned access to a procedure that they knowingly and intentionally withheld from Plaintiff, in order to deprive him of his constitutionally protected interests, as well as deprive him of his due process rights.

113.    Any such procedure offered – and interfered with by Defendants – was Constitutionally insufficient and constitutes an unlawful deprivation of Plaintiff's property interest, his right to due process of law, and is a violation of the 14th Amendment of the United States Constitution.

114.    As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss of career opportunities; mental and emotional distress; and loss of reputation and esteem in the community; and continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been delayed by at least 3 years.


**COUNTS II AND III – UNLAWFUL DISCRIMINATION AND RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
*against all Defendants*

115.    Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

116.    Title II of the Americans with Disabilities Act (ADA) prohibits state and local governments from discriminating against persons with disabilities.

117.    University Defendants are public school entities and are local governments subject to the ADA.

22

118. By and through its agents, representatives, policies, and procedures, Defendants engaged in intentional and unlawful discrimination against Plaintiff on the basis of his disability.

119. Plaintiff's mental health diagnoses are disabilities and defined by the ADA, and which impacted his daily life.

120. Plaintiff attempted to engage in the appropriate procedure to obtain accommodations, including by requesting a new advisor, counselor, and taking a Medical Leave of Absense.

121. However, Defendants retaliated against Plaintiff for engaging in this protected activity.

122. This includes, but is not necessarily limited to, Defendant Robichaud intentionally interfering with Plaintiff's leave of absence. Defendant Robichaud further caused severe emotional distress to Plaintiff by harassing him while he was on medical leave of absence and berating him in numerous emails.

   a. Defendant Robichaud acted in concert with other agents and actors of University Defendants to engage in this harassing behavior in order to pressure Plaintiff to quit.

   b. When this did not work, Defendants unlawfully removed him from the program.

123. Such actions were intentionally committed by Defendants against Plaintiff because of his status as a disabled student.

124. Defendants' actions were intentional, with reckless indifference to Plaintiff's rights.

125. Defendants intentionally refused to follow proper procedure, or their own obligations to provide valuable and relevant information to Defendant Promotions Committee regarding the work that Plaintiff was engaged in.

126. Defendants intentionally refused to take such actions because they were predisposed to treat Plaintiff differently because of his race/ethnicity, sex, sexual orientation, and disability.

127. Defendants would not have acted in this unlawful manner if Plaintiff was not disabled.

128. As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss of career opportunities; mental and emotional distress; and loss of reputation and esteem in the community; and continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been delayed by at least 3 years.

**COUNTS IV AND V – UNLAWFUL DISCRIMINATION AND RETALIATION IN VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, MCL 37.111 *et seq.* *against all Defendants***

129. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

130. The Persons with Disabilities Civil Rights Act (PWDCRA) prohibits educational facilities from discriminating against any individual regarding the full utilization of public accommodations, including educational facilities, on the basis of a disability.  MCL § 37.1102(1).

131. At all times relevant to this Complaint, Plaintiff was engaged, or attempting to engage in the educational facilities of Defendants, as a duly registered and admitted student of the public university Defendants Wayne State University, Defendant Medical School, and subject to the governance of Defendants Student Promotions Committee, and Professionalism Committee.

24

132. As set forth more fully above, Plaintiff was intentionally discriminated against on the basis of his disability by Defendants.

133. The University Defendants, through their agents and employees, including all defendants named in their officinal and individual capacities, intentionally excluded Plaintiff from the use and enjoyment of the public educational facility because Plaintiff has a disability.

134. Plaintiff attempted to request reasonable accommodations but was denied.

135. Plaintiff engaged in additional protected activity, including requesting and taking MLOA.

136. When Plaintiff did engage in protected activity, including reporting harassment and discrimination and/or taking MLOA, Defendant retaliated against him.

137. This retaliation included, but may not be limited to, harassing Plaintiff while on a Medical Leave of Absence and attempting to pressure and intimidate Plaintiff into a hearing while he was on medical leave.

138. Defendants acted in this unlawful manner intentionally, and with extreme disregard to Plaintiff's mental and emotional wellbeing.

139. As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss of career opportunities; mental and emotional distress; and loss of reputation and esteem in the community; and continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been delayed by at least 3 years.

**COUNTS VI AND VII – UNLAWFUL DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 *et seq.* *against all Defendants***

140.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

141.  University Defendants are educational institution(s) as defined by MCL 37.2101 *et seq*.

142.  Pursuant to the Elliot-Larsen Civil Rights Act, it is unlawful for an educational institution to discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of sex or sexual orientation, race/ethnicity, and/or gender.

143.  At all times relevant to this Complaint, Defendants had knowledge that Plaintiff is a male and is gay.

144.  At all times relevant to this Complaint, Defendants had knowledge that Plaintiff is Hispanic.

145.  Defendants intentionally, knowingly, and recklessly deprived Plaintiff of the full utilization of and/or benefits of Defendant University, Defendant Medical School, and the educational institution on the basis of Plaintiff's sex, sexual orientation, and race/ethnicity.

146.  Such discrimination included, but is not limited to, Defendant Yared retaliating against Plaintiff for declining sexual advances; Defendant Robichaud precluding Plaintiff for terms and services available to other students who are not gay and/or Hispanic and/or male, and the creation of a hostile education environment under which Plaintiff was so harassed and pressured that he attempted to take his own life twice.

147.  Defendants' unlawful actions also included the intentional and willful refusal to remediate the harassment Plaintiff suffered at the hands of Defendants' agents and employees due to

26

his race/ethnicity. By way of one example, this included the refusal to stop Plaintiff from being harassed for being a Hispanic student who speaks with an accent.

148. Defendants treated Hispanic students worse than comparable students of other races.

149. Defendant would not have treated Plaintiff this way if he was not male, gay, and or Hispanic.

150. After complaining about this discrimination and harassment, Defendants retaliated against Plaintiff.

151. This retaliation included, but may not be limited to, harassing Plaintiff while on a Medical Leave of Absence and attempting to pressure and intimidate Plaintiff into a hearing while he was on medical leave.

152. Defendants also treated students who are not gay better than gay students, including Plaintiff.

153. As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss of career opportunities; mental and emotional distress; and loss of reputation and esteem in the community; and continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been prolonged by at least 3 years.

**COUNT VIII – HOSTILE EDUCATION ENVIRONMENT IN VIOLATION OF THE
ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 *et seq.*
*against University Defendants, and against all other Defendants in their individual and
official capacities***

154. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

155. The purpose of the ELCRA is to target the prejudices and biases born against persons because of their membership in a certain class and to eliminate the effects of the offensive or demeaning stereotypes, prejudices, and biases.

156. The ELCRA prohibits discrimination on the basis of sex or sexual orientation by education institutions. The ELCRA defines discrimination to include "conduct or communication [that] has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive . . . educational, or housing environment." MCL 37.2103(k)(iii).

   a. This is commonly known and referred to as hostile environment harassment.

157. Each and every Defendant named herein displayed insulting, degrading, and demeaning discriminatory behavior and actions against Plaintiff on the basis of his sex and sexual orientation and ethnicity.

158. Such discrimination included, but is not limited to, Defendant Yared retaliating against Plaintiff for declining sexual advances; Defendant Robichaud precluding Plaintiff for terms and services available to other students who are not gay and/or Hispanic and/or male, and the creation of a hostile education environment under which Plaintiff was so harassed and pressured that he attempted to take his own life twice.

159. This conduct severely and substantially interfered with Plaintiff's education and his concurrent employment opportunities inherent in his education, and created an intimidating, hostile, and offensive education environment for Plaintiff.

160. As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss

of career opportunities; mental and emotional distress; and loss of reputation and esteem in the community; and continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been delayed by at least 3 years.

## COUNT IX – BREACH OF CONTRACT
### *against all Defendants*

161. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

162. Defendants offered, and Plaintiff accepted lawfully binding promises regarding Plaintiff's continued enrollment in Defendant Universities' program(s).

163. The process and procedures defined by the Student Promotions Committee Charter, the Professionalism Committee Charter, and the MD Student Handbook include required actions by persons, as well as guaranteed rights afforded to students, and constitute lawfully binding contractual agreements for each of the parties.

164. Defendants offered rights, policies, and procedures to Plaintiff, as a duly admitted student.

165. Plaintiff accepted those offers and in consideration thereof, paid tuition, among other forms of consideration to Defendants.

166. Defendants contracted to produce a policy and procedure that guarantees, among other things, the production of evidence against a student who is called before the Professionalism Committee.

167. Defendants failed to timely provide evidence to Plaintiff before it was used against him to call Plaintiff before the Committee(s).

168. Section 7 of the University Handbook requires that students be timely informed of professionalism citations issued against them.

169. The Promotions Committee Charter requires that evidence considered and/or used to take any adverse action must be disclosed to the student.

170. Such intentional disregard and failure to perform under the terms of the contract constitute an unlawful breach of such contract.

171. These breaches include, but are not necessarily limited to, a failure to timely provide evidence used against Plaintiff, as well as the continued refusal to adhere to the grievance procedure set forth in the contracts at issue.

172. Such intentional disregard for the rights contained therein include, but are not necessarily limited to the constant and obsessive contact of Plaintiff while he was on a medical leave of absence, which was in direct violation of the terms of medical leave set forth in Defendants' contract.

173. Plaintiff has suffered, and continues to suffer, economic damages as a direct and proximate result of Defendants' unlawful actions including loss of career opportunities; continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been delayed by at least 3 years.

**COUNT X – UNLAWFUL DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.***
***against all Defendants***

174. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

175. Race/ethnicity and Sexual orientation are protected categories under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

176.    Plaintiff, as a gay male, was in a protected category under the law.

177.    At all times relevant to this Complaint, Plaintiff was a student-employee, engaged in medical rotations, and other forms of employment through the University,

178.    At all times relevant to this Complaint, Plaintiff was qualified to act as a student-employee in Defendants' University and Medical School, as well as all medical facilities, healthcare facilities, including, *e.g.* hospitals, to which Plaintiff was dispatched to act as a medical professional, and through which said facilities received monetary compensation for medical services provided by Plaintiff.

179.    Defendants unlawfully discriminated and retaliated against Plaintiff on the basis of his sexual orientation when they intentionally dismissed him from the Medical School after he expressed consensual interest in a professor of the same sex as him.

180.    Defendants unlawfully discriminated and retaliated against Plaintiff on the basis of his race/ethnicity when they intentionally allowed their agents and employees to make derogatory statements about Plaintiff on the basis his race/ethnicity and further disciplined Plaintiff when he complained about it.

181.    Defendants would not have treated Plaintiff this way if he was not a gay male of Hispanic descent.

182.    Defendants unlawfully took adverse actions against Plaintiff in both his career and his academic studies on the basis of Plaintiff's protected race, sex, and sexual orientation classes.

183.    But for Defendants' unlawful actions, Plaintiff would have successfully completed his academic studies, degree, and workplace requirements.

184. But for Defendants' unlawful actions against Plaintiff, Plaintiff would be an MD, practicing medicine, and employed in the medical profession.

185. As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss of career opportunities; mental and emotional distress; and loss of reputation and esteem in the community; and continued professional and career deprivation, as his completion of the medical program, medical degree, and practicing medicine have been delayed by at least 3 years.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff, having been deprived of his Constitutional rights in violation of the Fourteenth Amendment of the United States Constitution, discriminated and retaliated against in violation of the Americans with Disabilities Act, the Persons with Disabilities Civil Rights Act, the Elliott-Larsen Civil Rights Act, as well as Title VII of the Civil Rights Act, in addition to being forced to endure a hostile education environment in violation of the Elliott-Larsen Civil Rights Act; and Defendants having breached their contractual obligations to Plaintiff, hereby requests this Honorable Court award him the following relief:

1. Damages for the emotional distress, mental anguish, embarrassment and humiliation;

2. Reinstatement in the medical school program, and immediate resumption where Plaintiff left his studies;

3. Economic damages to compensate Plaintiff for any loss of wages, loss of earning capacity, loss of tuition and/or tuition reimbursement, cost of loan forbearance and/or interest that was generated as a result of Defendants' unlawful actions;

4. Award Plaintiff punitive damages to the fullest extent allowable under the law due to the blatant disregard Defendants demonstrated for Plaintiff's rights under the Constitution of the United States, ADA,Title VII of the Civil Rights Act, the ELCRA, and the PWDCRA;

5. Reasonable attorney's fees and costs;

6. Any other legal or equitable relief that Plaintiff is entitled to as a matter of law.

Respectfully submitted,


Dated: June 17, 2026          /s/ *Veronica L. Stachurski*
                              Veronica L. Stachurski (P85110)
                              Attorneys for Plaintiff
                              Law Offices of Ward & Stachurski, PLLC
                              4131 Okemos Road, Suite 12
                              Okemos, Michigan 48864
                              (517) 347 – 8100

34

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CRISTIAN DIAZ,**

    Plaintiff

          v.

**WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE, WAYNE
STATE UNIVERSITY/ SCHOOL OF
MEDICINE PROFESSIONALISM
COMMITTEE, WAYNE
STATE UNIVERSITY/ SCHOOL OF
MEDICINE STUDENT PROMOTIONS
COMMITTEE, and
DARIN ELLIS, WAEL SAKR,
KELLY GROSS, LORETTA
ROBICHAUD, RICHARD BAKER,
CHRISTOPHER STEFFES, ADAM ZANGERLE,
ERIC AYERS, and NICHOLAS YARED,
each in their individual and official capacities,**

    Defendants.

Case No.
Hon.

---

Law Offices of Ward & Stachurski, PLLC
Veronica L. Stachurski (P85110)
*Attorneys for Plaintiff*
4131 Okemos Rd., Suite 12
Okemos, MI 48864
(517) 347-8100
lisacwardlaw@gmail.com

---

## **JURY DEMAND**

    NOW COMES Plaintiff, by and through his Attorneys, to request a trial by jury.

Dated: June 17, 2026          /s/ *Veronica L. Stachurski*
                              Veronica L. Stachurski (P85110)
                              Law Offices of Ward & Stachurski, PLLC
                              Attorney for Plaintiff
                              4131 Okemos Road, Suite 12
                              Okemos, Michigan 48864
                              (517) 347 – 8100